WILLIAM LEWIS DUNCAN, a minor, by Next Friend, John W. Duncan, Plaintiff-in-Error, v. HERBERT LEE FERRELL, Defendant-in-Error.—427 S.W.(2d) 36.

Western Section. December 14, 1967.

Certiorari Denied by Supreme Court April 1, 1968.

Walter Buford, Paul W. Denton, Memphis, for plaintiff in error.

Albert T. McRae, Memphis, for defendant in error, Nelson, Norvell, Wilson, McRae, Ivy & Farmer, Memphis, of counsel.

AVERY, P.J.(W.S.). This is a suit for personal injuries growing out of a collision between a motorcycle and a Chevrolet automobile in the intersection of Marsh and Benjestown Streets, on the 18th day of October, 1965 at approximately 3:20 p. m. Marsh Street runs east and west and Benjestown runs north and south through that intersection.

William Lewis Duncan, age 14 years, who was injured while riding as the second rider or passenger on a Honda

motorcycle, driven and owned by a boy friend, Larry Deal, who was also 14 years of age.

It is alleged that the motorcycle was designed to carry two people, the one behind the other. The seat was a long one, designed for two with certain attachments to support the second rider on which to place his feet and with others for support by his hands. The Chevrolet was owned and driven at the time by defendant, Herbert Lee Ferrell.

The main litigation is by the minor. His father also brought suit for expenses incurred through medical, hospital and other necessary expense on account of the son's injury.

The case was tried by his Honor, Judge Greenfield Polk, to a jury as a consolidated method by agreement. There was a jury verdict for the minor plaintiff in the amount of $4,000 and for the father plaintiff for $1,500.

The only appeal is in behalf of the minor. Exceptions were made and motion for new trial seasonably filed, heard and overruled. Exceptions were saved to the action of the Court in overruling the motion for new trial, and judgment on the verdict. An appeal prayed, granted and perfected in behalf of the minor, his suit being brought by his father as next friend to his son.

The case was heard in this Court on October 9, 1967, taken under advisement and is here disposed of by this opinion. The parties will be herein referred to as they were styled in the trial Court or by name, the minor Duncan as "plaintiff" and Herbert Lee Ferrell as "defendant".

The declaration in Count I charges common law negligence substantially as follows:

1—Defendant failed to keep proper control of his vehicle

2—Failed to obey rules of the road

3—Failed to keep proper lookout ahead

4—Driving at excessive speed

5—Turned into west bound traffic without taking proper care

6—Turned into west bound traffic before getting to intersection of Marsh and Benjestown

7—Failed to give a turning signal

8—Failed to yield to oncoming traffic.

Count II charges violation of City Ordinance Nos.: 1677.1; 1696(c); 1682; 1687.2; 1731.2; 1690; 1690.1; 1699.

Defendants filed general issue pleas and later by order, special pleas in which each allegation of both common law and statutory negligence is separately denied, and charging plaintiff violated each charge of negligence with which plaintiff charged defendant, and with violating T.C.A. Sections 59-829; 59-865 and City Ordinances Nos. 1696(c); 1708; 1731.2.

The assignments of error are generally explanatory of the statement of counsel for plaintiff that:

"Generally, the points raised in this appeal lie in severe inadequacy of the verdict and, more especially, in errors of the Trial Court in his instructions and refusal of requested instructions to the jury resulting in the severe inadequacy in the verdict, as more particularly specified in plaintiff's numbered assignments of error."

Assignments Nos. I and II bring error because the Court charged the jury on remote contributory negligence rule, and says such was not applicable, saying "the record being void of any evidence to support such charge * * * and failed to explain or define remote contributory negligence * * * with the result * * * that the jury was led or allowed to reduce the verdict to an amount severely inadequate."

The charge on remote contributory negligence and result, if found, is as follows:

"If the plaintiff, Duncan, Jr., was guilty of negligence which did not directly and proximately contribute to the injury and damages complained of by both plaintiffs, but which only remotely contributed to the injury and damages complained of by these plaintiffs, then there may be a recovery but you must diminish the amount of damages you award each plaintiff by the degree of remote contributory negligence you find the plaintiff, Duncan, Jr., guilty of."

Assignment of error No. III brings error because the Court charged the jury on the doctrine of assumption of risk.

Assignment of error No. IV brings error alleging that the charge given on the doctrine of the assumption of risk violates Article 6, Section 9 of the Constitution of Tennessee.

Assignment of error No. V embraces I, II, III and IV and is as follows:

"The Court erred in giving any charge on contributory negligence, proximate or remote, or on assumption of risk, there being no evidence to support any such

charge, and erred in that all of the instructions so given were rendered erroneous by the Court's instruction and query to the jury: 'Who hit whom? There your issue is. Do you see the point'?, to the prejudice of the amount of the verdict.''

The whole charge of the Court consists of 46 and a fraction typewritten pages and in many respects it is extremely repetitious and it is hard to separate this long charge so as to put together that part of it which embraces the errors included within the five assignments of error above set out, and particularly is this true where the Court tries, in his charge, to differentiate between common law negligence, statutory negligence and assumption of risk.

Let us observe in the first place that the Court below was dealing with and we, in this appellate court, are dealing with a passenger or second rider on a motorcycle which in its manufacturing or making is designed to comply with T.C.A. Section 59-865 and with City of Memphis Code Section 1708, the phraseology of which is practically the same, and regardless of phraseology, the meaning is identical and we are, as was the lower Court, concerned with the application of the common law to the facts revealed by this record.

■ Under the common law the simple fact that a person is a second rider on a motorcycle or motorbike does not in and of itself, put the burden of ''assumption of risk'' on such rider. T.C.A. Section 59-865 is as follows:

''A person operating a motorcycle shall ride only upon the permanent and regular seat attached thereto and such operator shall not carry any other person, nor shall any other person ride on a motorcycle unless

such motorcycle is designed to carry more than one (1) person, in which event a passenger may ride upon the permanent and regular seat if designed for two (2) persons, or upon another seat firmly attached to the rear or side of the operator.''

Section 1708 of the Municipal Code of the City of Memphis is as follows:

''A person operating a motorcycle or a motordriven cycle shall ride only upon the permanent and regular seat attached thereto. Such operator shall not carry any other person nor shall any other person ride on a motorcycle unless such motorcycle is designed to carry more than one person, in which event a passenger may ride upon the permanent and regular seat if designed for two persons, or upon another seat firmly attached behind the operator's seat.''

It is clear from these Code Sections that neither the State law nor the Municipal statute saddles a second rider on a motorcycle ''designed to carry more than one person'' as stated, the burden of assuming liability for the injuries he may sustain simply because he is such rider.

■ Neither by common law nor statute is such equipment declared to be a ''dangerous instrumentality'' and as we understand the applicable law, counsel for plaintiffs-in-error have correctly stated:

'' 'A motorcycle in and of itself, absent of other factors is not a dangerous instrumentality, and negligence is not to be inferred from the mere use of a motorcycle as a means of transportation'.''

At the conclusion of the Court's general charge he had before him a special request referred to in the record as "Plaintiff's Special Instruction No. 6", as follows:

"Gentlemen of the Jury, I instruct you that: A motorcycle in and of itself, absent of other factors is not a dangerous instrumentality, and negligence is not to be inferred from the mere use of a motorcycle as a means of transportation."

. This request, along with several others submitted by the plaintiffs was refused.

Assignment of error VI brings error on the refusal of the Court to give in charge said Special Request No. 6.

Assignment of error No. VII brings error to the action of the Court in excessive repetitious reading in its instruction to the jury the provisions of T.C.A. sec. 59-865 and Memphis Traffic Code Section 1708.

Assignment of error VIII is not herein copied because it is fully embraced in assignments of error Nos. IV and VII.

Stated in simple terms, this record reveals that Benjestown south of its intersection with Marsh, is much narrower than it is as it passes through the intersection or as it extends north from the intersection. Mr. Louis Edward Strum had driven up to the intersection on Benjestown from the south in his proper traffic lane, but had not entered, as claimed by defendant, into any portion of the intersection because of the stop sign on Benjestown, which Mr. Strum properly obeyed. Defendant reached the intersection at approximately the same time as did Strum traveling east on Marsh, with a car to his

right traveling his same direction and with the Strum car stopped at the intersection.

The deceased approached that intersection traveling west on Marsh behind an automobile. If it could be said that the contradictory statements made by the defendant could be believed, he saw the Strum car on his right facing the intersection, he saw the car on his right passing him going into the intersection, he saw the car entering the intersection traveling west in front of the motorcycle, and he admits that this car traveling west behind which the motorcycle was traveling, got through the intersection without hitting his automobile and that in making his turn from an eastern direction, within that intersection to a northern direction, which would have carried him north on Benjestown, this collision with the motorcycle and his car occurred before he ever saw the motorcycle, and clearly shows that he was traveling through that intersection with a turning position quickly behind the car that was in front of the motorcycle without determining that he could make that turn in safety.

If he stopped, as he said he did, because Strum's car was sticking out in that intersection, he had every opportunity to determine whether or not that he could make the turn in safety that he wanted to make. The proof is further abundant and clear that there was a car approaching that intersection following the motorcycle driven by Mr. Garrett.

There is no proof in this record which would have justified the jury in finding that the plaintiff either assumed the risk of being injured or of violating either the statutes of the State or the City Ordinances of the City of Memphis. Evidently the jury found that plaintiff did

not assume the risk of being injured and did not violate either the State laws or the City Ordinances.

On page 367 of Vol. 4 the Court quoted the provisions of T.C.A. sec. 59-829 dealing with the right of a driver of a vehicle already within an intersection when another approaches and turning to his left to continue, after he has given a signal of his intention, requiring the other vehicles to yield the right-of-way. He immediately quoted T.C.A. sec. 59-865, which is the second rider motorcycle statute.

The proof is positive and undisputed that on the involved motorcycle there was a seat "designed for two persons". The Court having immediately quoted the above T.C.A. Section, followed it by quoting City Ordinance No. 1696-C, which is referred to as the "Devotion of Full Time Ordinance" which provides:

"It shall be unlawful for a driver of a vehicle to fail to devote full time and attention to the operation of such vehicle when such failure, under the then existing circumstances, endangers life, limb or property."

The Court immediately directed the attention of the jury again to the "Riding on motorcycle Ordinance of the City", and said:

"I will forego reading that specifically to you, because it is in exactly the same language as the one I just read to you. No, I had better read it, just for the sake of the record."

He then read that Section 1708 word for word, which is identical in meaning with T.C.A. sec. 59-865. If the Court, after saying "I will forego reading that specifically to you because it is exactly the same language as the one I

just read to you'', had not said. ''No, I had better read it, just for the sake of the record,'' but after saying that, then to turn immediately and read it verbatim to that jury, gave a special emphasis to that motorcycle ordinance with respect to a second rider, which he was not warranted in so doing. To that jury it meant no more than if he had said ''you had better give attention to this statute and this ordinance for I am going to put it in the record.''

Immediately following the above statement the Court then said to the jury:

''Mr. Ferrell alleges that on the occasion in question that the plaintiff, Mr. Duncan, Jr., was guilty of negligence which was the direct and proximate cause of his injuries and damages, in that he was improperly riding on a motorcycle, in that he, the guest, Duncan, Jr., in the interest of his own safety failed to keep a proper lookout ahead; that he, Duncan, Jr., as a guest, in the interest of his own safety was aware of the reckless and dangerous manner in which the vehicle he was riding on was being operated, and failed to warn or remonstrate or protest to his host, Larry Deal, about the reckless, dangerous and negligent manner in which the vehicle, namely the motorcycle, was being operated.''

Without a break in the charge he immediately then said to the jury:

''The defendant Ferrell alleges and says that the following State Statutes of the State of Tennessee were in full force and effect and that the violation of these State Statutes by the plaintiff, Duncan, Jr., was

also a direct and proximate cause of or contributed to the injuries or damages sued for by Duncan, Jr.''

He again read completely T.C.A. Section 59-865. He then charged the jury again:

''The defendant, Ferrell, also alleges that the following Ordinances of the City of Memphis were in full force and effect and alleges that the violation of this Ordinance by the plaintiff was a direct and proximate cause of or contributed to the injuries and damages to the plaintiff. Once again, I will tell you, it is the same Section that I read to you, Section 1708 of the City of Memphis Municipal Code, with regard to the riding of a passenger on a motorcycle, and I have read that twice before, so this time, I really am going to forego reading it to you.''

At that point after having quoted and requoted both the City Ordinance and the Statutes of Tennessee, he said:

''It is next the theory of the defendant, Mr. Ferrell, ladies and gentlemen, that any damage that Mr. Duncan, Jr., or Mr. Duncan, Sr., may have sustained was due to or contributed to by the negligence of Mr. Duncan, Jr. himself, in that he, Duncan, Jr., assumed the risk, in connection with the accident alleged to have given rise to his injuries, by riding on a motorcycle in the manner in which it is alleged and contended by the defendant.

''In short, he says this: He says Duncan, Jr., by doing all of the things he did on the day in question in connection with riding on this motorcycle up to and during the time of the accident, assumed the risk of the things that followed; to-wit, the accident and injuries; and

as a result of all of the foregoing theories outlined by the defendant, the defendant Ferrell says neither one of these gentlemen are entitled to recover, either Duncan, Jr., for his personal injuries, nor his father, Duncan, Sr., for his special damages; to wit, the amounts of money he has paid or will have to pay in an effort to have this boy cured or healed or improved from his injured condition.''

We can hardly see how the jury could have come to any conclusion from these repeated statements and the Court's reference to the pleadings in the case, other than to conclude that the pleadings were proof also.

The Court, after he had repeatedly set forth the theories of negligence, both under the common law and the statutory-city ordinances, and particularly emphasizing the second rider statute by a continual repetition with respect to the defendant's plea of contributory negligence, simply said:

''Now, ladies and gentlemen, outside of the question of the alleged negligence of the defendant, Mr. Ferrell, you also have a question of the alleged negligence of the plaintiff, Mr. Duncan, Jr., at the time and place of this accident. Now, with regard to contributory negligence, let me tell you first. The law as to the burden of proof with reference to contributory negligence is that the burden of proof is upon the defendant who brings it up, who relies upon it to show that the plaintiff was guilty of contributory negligence.''

To have stated the rights of the parties with respect to the burden of proof, and in light of the whole charge he should have added to that statement—however, where the defendant has plead a violation of the law of the

road on the part of plaintiff as a defense of contributory negligence, then the burden is on the defendant to prove that such violation occurred and did constitute the proximate cause or contributed thereto.

Before he closed his charge he charged the jury as follows:

"Now, with respect to the law as regards State statutes and City Ordinances that I have read to you and upon which these parties rely, the Court gives you this instruction: It is the duty of every driver of an automobile or every other person, be he a driver or a passenger or a guest in an automobile or any other motor vehicle upon the public highway or within the City limits of any city of this State—and in this case, that would mean Memphis, Tennessee — to obey any State Statute or City Ordinance provided as to how that person should drive, operate a motor-driven vehicle or otherwise conduct himself or herself, even where they are a guest in an automobile, or, in this case, a motorcycle; and the Court instructs you that the State Statutes and City Ordinances that have been relied upon and pleaded by both sides in this trial were, in truth and in fact, valid City Ordinances and State Statutes respectively of the City of Memphis and the State of Tennessee at the time and place this collision is alleged to have occurred; and further, it is the duty of any person to obey any State Statutes or City Ordinances and conduct himself or herself and to operate any vehicle he is operating in accordance with any State Statutes or City Ordinances that may be applicable to that person under a given set of circumstances.

"If a person violates one or more of the Sections of any State Statutes or City Ordinances that may be applicable to him, in your judgment, that violation or those violations become an act of negligence, in and of itself, for under our law, a violation where it is applicable to a given person is an act of negligence."

Immediately following the above quote and to the jury the Court said:

"Now, ladies and gentlemen, the law on proximate cause is as follows. This is the keystone. In cases such as each of these two are, before you predicate liability in the given case against the defendant in the given case for an act of or acts of negligence, either under common law or for an alleged violation or violations of any State Statute or City Ordinance, the Court instructs you that the plaintiff in the given case must show by the preponderance of the evidence that the act or acts of negligence, either under common law or for an alleged violation of a State Statute or City Ordinance, is the proximate cause of the collision, accident and resulting injuries or damages to the particular plaintiff."

We do not find anywhere in the charge that the Court said to the jurors, in effect, that if they found both plaintiff and defendant were violating the State Stautes or the City Ordinances set out in the declaration and in the pleas, it would be their duty to determine which of such violations, if either or both, constituted the proximate cause of the collision and injury to plaintiff. The burden of proving such violation as a contributory cause affecting plaintiff's right of recovery is on defendant.

The Court, when he was explaining the contention of the defendant Ferrell, that he was driving in a prudent

manner at a reasonable normal rate of speed; had given a proper signal that he was going to turn to the left to go north on Benjestown road:

"* * * was struck by the motorcycle being operated by Mr. Deal, who was the host of the plaintiff, Duncan, Jr. In short, the defendant, Ferrell, says the motorcycle ran into him and he, Ferrell, did not run into the motorcycle; and that he, Ferrell, was first to begin the turn in the intersection and that the motorcycle came on thereafter and ran into the side or a part of the Ferrell automobile."

He then explained that the plaintiffs contended that it happened in just the opposite way:

"* * * that at the time Mr. Ferrell began his left turn to go north on Benjestown Road, the motorcycle was already in the intersection and, therefore, Mr. Ferrell should have yielded and let the motorcycle go on past, which allegedly Mr. Ferrell did not do, and there your issue is: Who hit whom? Do you see the point?"

We wish the issues could be this simple, but they are not and that statement is not an explanation of the governing law.

Dr. B. C. Mitchell, treating orthopedic surgeon, first saw him October 18, 1965 in the emergency room at St. Joseph. Gave history of accident. He described him in this manner:

"He was an acutely injured boy of 14 years with an obvious injury to the right lower extremity consisting of a compound type wound located at the mid portion of the right thigh. Also, there was noted a rather

severe laceration of the leg midway between the ankle and the knee and the front of the leg.''

The bone protruded through the skin. His blood pressure was stabilized; he was X-rayed after danger of shock had passed. Several parts of the body were revealed in the X-ray and there was a comminuted fracture at the junction of the middle and lower one-third of the right femur or thigh bone.

The bone was in several fragments. The pictures from the X-ray were put on the board, the pictures of the broken hip bones and the pictures of the limb between the knee and ankle. The laceration below the knee exposed the bone but no fracture at that point. From the pictures made a drawing of the bones of the legs was made and is Exhibit 14.

The boy was admitted to the hospital where he underwent surgery with general anesthesia, the wounds were cleansed thoroughly and repaired. Metallic wire was inserted through shin bone just below the knee, the wire being run through the bone as shown in Exhibit 14. Tension on the wire is fixed at from 20 to 30 pounds. He examined Exhibits 2, 3 and 4. These wires held the fractures in position until new bone could form. Traction maintained until sufficient new bone is formed to put on a cast. Such traction continued from October 18 through November 16 when he was carried to operating room and plaster cast applied under general anesthesia. The surgery is recognized as major surgery. When the cast was applied it extended above the waist line down the entire length of the leg to the toes. It is what is termed a spica cast.

Pictures of this young man undergoing the treatment as shown by the cast, traction etc. are numbered 2, 3, 4 and 5. They were exhibits to the testimony of plaintiff's mother. He was unable to take care of the body discharges, had to be helped by his mother without leaving the bed. He could not turn his body by himself. His elbows, back of his hands and heels would get sore and have to be cared for. He was in the hospital 29 days in traction. The skin under the cast became "kind of raw" but without bed sores. After removal of cast he was confined to the bed for 21 days when he was permitted to get up on crutches. These pictures were explained by the father as well as by the doctor.

This boy was unconscious two days immediately after the injury. He could not even walk with crutches until about April 15, 1966. He still has a stiff knee. He had not become able to compete in any kind of sports at the time of the trial. He was out of public school for about a year, a part of that time had a teacher that came to his home. He failed 8th grade on account of his disability.

Dr. Mitchell says that by March 12, 1966 the X-ray taken then revealed solid enough bone union so he could start full weight bearing. He had seen him after March 12th, on April 30, June 15 and September 14, of 1966 and again January 9, 1967.

Dr. Mitchell explained in the X-ray made in January '66 it revealed some fragments of bone which showed there had not been an end to end reduction or alignment, but he expressed the opinion that it was a satisfactory alignment. He explained that new bone could be seen forming. He explained that there was no way that a doctor could set the fractures in that location so they would be absolutely together; that the muscle spasm could not

be overcome merely by the pull of the wire. He explained an X-ray of the injured limb made on September 14, 1966 in which he explained this indicated a process of re-alignment. He further explained that the large muscle in the front of the thigh:

"is the most valuable muscle in the front of the leg or in the entire leg so that scar and that sort of thing has reduced the size and volume of this muscle, and in spite of his relative youth and in spite of his desire to increase it all the time, to work with it, this has been a persistent problem so that the size of the leg and strength of that muscle has not returned as we would like for it to have."

He further stated:

"There has been up to this moment a very severe restriction of motion in his knee. Again, this is not the ordinary, and this has been a source of real concern to me. Up until when this film was made, he had only regained about 90 degrees of motion. At the last time I saw him, he had a little bit over 100. How much more he will get, I don't know. He may improve some more, but I had rather think now after this rather protracted period of time that the ability to even recover that motion is severely in jeopardy, so that I am inclined to say he will probably not get an appreciable amount in return due to that."

He then stated:

"It is my assumption that on the basis of muscle atrophy and basis of restriction of motion in his knee, there will be some permanent disability to this extremity * * * I feel that he has lost about 25 percent use of the extremity as a result of this injury.

Q—And to the body as a whole, what would this permanent disability be?

A—One-half of that, or about 12½ percent of the body as a whole."

The charge for his services was $400.00. He further stated he considered the hospital bill of $817.30, which was handed to him itemized, was reasonable.

He further stated, in answer to proper question relating to the plaintiff:

"His leg has lost this strength, and he has continued restriction of motion. I don't mean to imply he can't do some things, but I believe with a weakened extremity, such as he has, his ability to carry out contact sports would be rather severely handicapped."

On cross examination he said:

"I think the most troublesome thing has been lack or loss of muscle mass in the front of his thigh and the stiffness of his knee, yes. That has been the persistent and lingering problem."

Dr. Marcus Stewart, also an orthopedic surgeon and associated with the same institution as Dr. Mitchell, was examined by deposition. He examined the plaintiff on the 31st day of January 1967. He explained his examination and said the plaintiff's "chief complaint at that time, which was pain in his right thigh, knee, and anterior portion of his leg." In simple terms he said that his examination showed him to be a "well-developed, well-nourished 16-year old white male in no acute distress." He described the lower extremities as "full range of painless motion of both hips, left knee, and both ankles." Both knees were equal in circumference. There was good

forward, backward and side-to-side stability of motion. He said:

"The deep tendon reflexes were present, equal, and active bilaterally. Sensation is equal and active bilaterally with the exception of an increased sensation about the scar in the right pretibial area."

He explained his diagnosis as being:

"An old fracture of the right femur, healed; old soft tissue laceration of the right lower leg, healed, with excessive scar formation."

He further stated that the "good, backward, foreward and side-to-side stability of the knees indicated that plaintiff had no litgamentous instability or bony abnormality in the knees."

He explained that the nerves and the blood vessels of the extremity were functioning normally. He stated, in answer to proper question in effect, that he thought the plaintiff would be able to play the game of baseball.

On cross examination he stated that in his opinion the plaintiff had 40 degree restriction of motion in the flexion of his right knee and on proper question, he stated that in his opinion he did have a permanent disability to his right leg and "It is my opinion he has a 15 to 20 percent permanent partial disability of the right lower extremity."

He further stated that the patient was referred to him by Mr. Albert McRae. The record shows Mr. McRae is the attorney representing the defendant and that he never saw the patient but the one time on January 31, 1967, and that his employment and examination "was to evaluate the patient's disability."

The doctor said he didn't consider himself an expert on baseball, and that he had never played baseball professionally or semi-professionally.

As revealed by the assignments of error and argument, the real question before this Court is whether or not the verdict of the jury is inadequate to such an extent as that the record reveals that a lack of compensation for the injury involved, as revealed by the verdict of the jury, affected by the alleged erroneous action of the Court, as revealed by his charge, particularly that part of the charge which relates to contributory negligence. The emphasis in these assignments of error particularly complain that the Court charged too much repetition relating to the defense of contributory negligence, the effect of charging our doctrine of remote contributory negligence, in the manner charged, and the assumption of risk.

In short, the argument is that there is nothing in the record which justifies the charge of contributory negligence, assumption of risk and particularly that the Court failed to define remote contributory negligence in a proper way.

We might ask ourselves the question, what had the plaintiff done to warrant a charge on the doctrine of assumed risk? After telling the jury that the defendant relied upon the fact that the risk of injury had been assumed by the plaintiff, in addition to that copied on page 9 of this opinion, he charged the jury in the following words:

"Ladies and gentlemen, the defendant, Mr. Ferrell, has also pleaded and relied upon the doctrine of assumption of risk by the plaintiff, Mr. Duncan, Jr. It is the theory and contention in this connection of Mr.

Ferrell, the defendant in these cases, that the plaintiff, Duncan, Jr., assumed the risk incident to riding on the rear side of the Honda motorcycle. On this occasion, the doctrine of assumption of risk, in its simplest and primary sense, means that the plaintiff, Duncan, Jr., has allegedly given his express or implied consent to relieve the defendant of an obligation of conduct toward him and to take his chance of injuries from a known risk.

"By entering freely and voluntarily into any situation which presents obvious danger, a person may be taken to have accepted and agreed thereby that he would look out for himself and relieve the other person participating of responsibility for what follows.

"This is also true, however, ladies and gentlemen, that before the doctrine of assumption of risk can be applied in these two cases, it must be shown to your satisfaction by the greater weight or preponderance of the evidence that the plaintiff, Duncan, Jr., knew of the dangers involved; that is to say, that he, Duncan, Jr., appreciated and comprehended and understood the danger involved and that he voluntarily assumed the risk incident thereto."

In a case, such as this, where both common law negligence and violation of statutory negligence and city ordinances are alleged by each party, such expressions as "this is the keystone" and "your issue is, who hit whom? Do you see the point?" are legally misleading. We wish the issues could be this simply stated, but such is not the governing law.

These assignments of error that go to the alleged erroneous charge on the assumption of risk simply re-

quire an analysis of what the plaintiff, Duncan, Jr. had done to warrant the charge of assumption of risk.

A very short distance from the scene of the accident while Larry Deal and plaintiff, Duncan, Jr. were at school together, Duncan, Jr. seated himself on the rear seat of a motorcycle designed to carry two persons. He rested his feet the entire distance on the protruding bars put there for the second rider. He held with his hands the strap support that was fastened to that vehicle for a second rider to hold to.

A short distance from the school the motorcycle entered Marsh street, a wide street of some 40 feet on the pavement with a white stripe down the center and the vehicle traveled in its proper traffic lane to the point of the intersection where the accident occurred.

In front of the motorcycle there was an automobile traveling the same direction. In the rear of the motorcycle there was a motor vehicle operated by a Mr. Garrett following the motorcycle. The motorcycle at no point prior to the time of the collision exceeded the speed limit.

Nothing is better proven in this record than that fact and proceeding to that intersection, as just stated, they entered a space where Benjestown joined the south line of the intersection with the width of approximately 20 feet or less. Approaching that same intersection on Marsh street, traveling east was the defendant in the lane next to the center or white line of Marsh with another automobile to his right or outer lane traveling the same direction. Also there approached that intersection in his proper lane from the south a car which stopped at the stop sign on Benjestown before entering that intersec-

tion. Marsh street is open or a through street over that intersection.

There is an open unobstructed view from that intersection east to Sunrise street which enters Marsh 292 feet from that intersection. The defendant came into that intersection, as he states, with a purpose of turning to his left which would put him across both the traffic lanes on Marsh to his left, and which was open for traffic flowing west through that intersection.

At some point within that intersection he met the car traveling in front of the motorcycle which turned to its right or north on Marsh and, at a point some 9 feet and seven inches from the east margin of that intersection, as he made his turn to his left, his car and the motorcycle came together, as the motorcycle had through passage over that intersection, and the damage to his car as shown by Photograph, Exhibit 8, he met the motorcycle almost headon, the bent section of the front of his car being just inside of the right front wheel.

Defendant never saw the motorcycle until it and his car came together. Mr. Strum, who was stopped and looking directly north through that intersection, says he saw defendant's car as it flashed through his vision, he heard the sound of the exhaust of the motorcycle immediately thereafter and immediately he heard and saw the collision.

Mr. Garrett, who testifies that as the motorcycle came into Marsh street at an intersection just beyond the intersection of Sunrise, followed that motorcycle the entire distance,—which appears to be about two blocks and unequivocally states that neither he nor the motorcycle exceeded the speed limit of 30 miles at that point, and

uses the expression, 20 to 25 miles, and then said, "if I had to swear, I would say less than 25."

Defendant claimed the motorcycle exceeded the speed limit but the only allegation about its excessive speed is in the pleas of the defendant.

Nothing is better proven by the circumstances appearing in that intersection as hereinabove stated, than that the defendant, after meeting the car traveling in front of the motorcycle and that within a second's time all that plaintiff could say was "lookout". Nothing had been done from the moment he got into the seat for the second rider on that motorcycle to warrant his admonition to the driver about anything up to that very moment when he said "lookout".

The only dispute about any of the testimony of either of the witnesses is in the fact that defendant says he stopped at the intersection as he approached it on Marsh because Mr. Strum's car had protruded into the intersection a very short distance and Mr. Strum says that I didn't do that, I stopped at the point where the stop sign directed me to stop and I was there when this collision occurred.

So we ask ourselves the question, what had the plaintiff done outside of taking his seat on a motorcycle designed to carry two people, as provided by T.C.A. Section 59-865 and Municipal Ordinance Section 1708, or what had he failed to do which would justify the defense of remote contributory negligence, contributory negligence or assumption of risk?

Generally speaking, assumption of risk grows out of a contractual relationship, however, it is now applicable sometimes to one's activities when injured in a

collision of motor vehicles based upon his knowledge that there is danger in what he is doing or what he does not do to protect himself, and it is so close kin to our Tennessee doctrine of contributory negligence, that it constitutes a problem for a Court, where both assumption of risk and contributory negligence are invoked by a defendant toward a plaintiff, that it is hard for the Court, in framing his charge, to define the difference between the two, however, there is a difference, but there can be contributory negligence of a remote character without an assumption of risk by plaintiff and the reverse is true. However, where there are no facts on which to base an assumption of risk, such defense should never be charged, and as we view this entire evidence, we find nothing that justified the Court in repeating over and over T.C.A. sec. 59-865 and Memphis Municipal Code 1708, and then charging assumption of risk as plead in defendant's pleas, which is not proof unless he construed the second rider statute to mean that though a motorcycle was designed to carry two people or a second rider, such as the motorcycle involved in this case, that because one used the seat thereon, as provided by law, was in and of itself an assumption of risk of injury that might in anywise occur while he sat thereon.

We are mindful of the fact that this Court has a right, under the proper consideration of a record, when it has arrived at the fact that there is error in the charge that affected the verdict of the jury, such as may be invoked where a successful plaintiff is refused adequate compensation which we feel has resulted in this case, to remand it upon a question of damages only and we have been requested to find that the alleged errors of the Court in his charge and by refusing to charge special requests by

plaintiff has so affected the amount of the verdict in this case that it should be reversed and remanded only for the reconsideration of the amount of damages at a new trial. We do not feel justified in assuming that authority. The judgment does not seem to be so inadequate alone as indicates caprice, sympathy, compassion or prejudice which resulted in a fraudulent verdict.

In this connection we would like to point out that no where in the assignments of error is it assigned that the verdict, standing alone, is so grossly inadequate to compensate the plaintiff for the injury, that it amounts to a fraudulent verdict. The assignments merely address themselves to the fact that the charge of the Court caused the jury to render an inadequate verdict.

We think that assignment of error V should be and we do sustain it and in so doing, we construe it to include the same as assignments I, II, III and IV.

We feel that this special request # 6 should have been given in charge to the jury. We think it is not as complete as it could have been. There was only one motorcycle involved and certainly if the request had been charged the jury would have understood it referred to the involved motorcycle. This assignment of error is sustained.

 The essence of the request is not embraced within the general charge of the Court and we think would have lessened the effect of the repetitious reading of T.C.A. sec. 59-865 and City of Memphis ordinance 1708. We are further of the opinion that the numerous readings of said T.C.A. Section and said Ordinance 1708 so accentuated by the Court's charge in the words contained in his general charge on the doctrine of assumption of risk and that defendant's plea of assumption of risk amounted

to evidence that plaintiff had assumed a dangerous risk and in our opinion, to some extent, did influence the jurors in arriving at the amount they thought necessary to compensate the plaintiff for the injuries he received.

It is true that contributory negligence, assumption of risk and sudden emergencies may arise in the same case and under certain conditions, the respective defenses are not incompatible with each other. It is said, however, in 38 Am.Jur. Section 172, page 847:

"However, there is a clear distinction between the defense of assumption of risk and the defense of contributory negligence, notwithstanding that they may arise under the same set of facts and may sometimes overlap. There is a line of demarcation which, if carefully scrutinized and followed, will allow the court to differentiate between them. * * *

"As stated in some decisions, assumption of risk is a mental state of willingness, whereas contributory negligence is a matter of conduct."

Section 173 states: "Knowledge and appreciation of the danger is an essential of the defense of assumption of risk. The doctrine does not apply unless the particular condition of peril has continued long enough so that the person alleged to have assumed the risk can be found to have known or to have been charged with knowledge of the danger."

Insofar as this record before us indicates, there was no danger existing to the plaintiff, Duncan, Jr., until after defendant's automobile and the involved motorcycle were both within the involved intersection. The imminent danger began when defendant started his turn in front of the motorcycle. Therefore, plaintiff was not then re-

quired to express a warning to Larry Deal, the driver, for it would have been impossible under the proof, for Larry Deal, after receiving such warning to have maneuvered the motorcycle so as to prevent the collision in which plaintiff was injured. Thus, such warning would have been useless. We feel the doctrine of assumption of risk was not applicable and should not have been charged, but since it had been, special request No. VI should have been granted and charged. In other words, we feel that the order in which the general charge to the jury was given so intermingled the essence of the allegations of the common law counts with the essence of the allegations in the statutory counts, that the jury was unable to distinguish the difference.

■ We think the appellate court should remand a case of the character here involved for a new trial, "to be heard on amount of damages only" where there appears to be an extreme injustice. Otherwise, it would be a dangerous precedent to follow, and while we feel that there is error in the charge of the Court which requires us to set aside the verdict and remand the case for new trial, our judgment should not restrict the remand hearing to the amount of damages only.

For the reasons stated herein, the verdict of the jury and judgment of the Court thereon is set aside and the case is remanded for new trial in its entirety not incompatible with this opinion.

Judgment will be entered accordingly, and cost in this Court adjudged against the defendant-in-error.

.. The applicable rule is that if an improper act be not with a design to bias or influence the jury, but a mere inadvertence without any improper design, and if it can

be safely assumed that it had no improper influence on the minds of the jurors, then there is no reasonable ground to disturb the verdict. Vaughn v. Dotson, 32 Tenn. 348. (Cited in Shew v. Bailey, 37 Tenn.App. 40, 260 S.W. 2d 362.)

Carney and Bejach, JJ., concur.